

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF TEXAS
DEL RIO DIVISION

| | | |
|---|---|---|
| JENNIFER GUADARRAMA, | § | |
| | § | |
| Plaintiff, | § | |
| | § | |
| v. | § | |
| | § | |
| | § | |
| THE GEO GROUP, INC., VAL VERDE | § | CIVIL NO. DR-22-CV-32-AM/JAC |
| COUNTY, WARDEN CHRISTOPHER | § | |
| MARTINEZ, ANTONIO CADENA, JR. | § | |
| M.D., JETHER FARINO, M.D., | § | |
| JESSICA BEACHKOFSKY, M.D., AND | § | |
| MAGDALENE GARZA M.D., | § | |
| | § | |
| Defendants. | § | |

## ORDER

Pending before the Court are the following motions to dismiss: (1) Defendant Val Verde County's Motion to Dismiss Plaintiff's Amended Complaint [ECF No. 54]; (2) Motion to Dismiss Plaintiff's First Amended Complaint Against Defendants Jether Farino, M.D., Jessica Beachkofsky, M.D., and Magdalene Garza, M.D. Pursuant to Fed. R. Civ. P. 12(b) [ECF No. 57]; (3) Motion to Dismiss Plaintiff's First Amended Complaint Against Defendant Antonio Cadena, Jr., M.D. Pursuant to Fed. R. Civ. P. 12(b) [ECF No. 61]; (4) Christopher Martinez's Motion to Dismiss (ECF No. 63); and (5) The GEO Group, Inc.'s Motion to Dismiss [ECF No. 64].

Also pending before the Court are four motions to quash: (1) Defendant Val Verde County's Motion to Quash Plaintiff's Subpoena to Testify at a Deposition Served on Sheriff Joe Frank Martinez [ECF No. 37]; (2) Defendant Val Verde County's Motion to Quash Plaintiff's Notice of 30(b)(6) Deposition [ECF No. 38]; (3) Defendant GEO Group, Inc.'s Motion to Quash Notice of 30(b)(6) Deposition [ECF No. 39]; and (4) Defendant Val Verde County's Motion to Quash Plaintiff's Written Discovery to Val Verde County [ECF No. 40].

For the following reasons, the motions to dismiss [ECF Nos. 54, 57, 61, 63, 64] are **GRANTED**. Because all claims are dismissed, the motions to quash [ECF Nos. 37, 38, 39, 40] are **DENIED AS MOOT**.

## I.    ALLEGED FACTS

This suit arises from the tragic death of a young man who was detained at a correctional facility while awaiting trial. Keegan Killin ("Killin") was arrested and charged with violating a federal crime on November 20, 2019. (ECF No. 48 at 22.) Thereafter, Killin was transported to the Karnes County Correctional Facility, a private correctional facility owned and operated by Defendant The GEO Group, Inc. ("GEO"). (*Id.*) Upon arrival, Killin completed a suicide screening form, in which he indicated prior diagnoses of insomnia, anxiety, depression, and post-traumatic stress disorder ("PTSD"). (*Id.*) He further shared that he received medical care in 2019 for his emotional and mental health. (*Id.*) As part of the intake process, Killin also underwent a mental health evaluation. (*Id.* at 22-23.) The evaluation showed that Killin took Trazadone and had been a victim of physical and sexual abuse. (*Id.*)

Killin was transferred to the Val Verde County Correctional Facility ("VVCF") on December 5, 2019. (*Id.* at 23.) VVCF is "owned" by Defendant Val Verde County and houses both local and federal pretrial detainees.[1] (*Id.* at 9-11.) In 2006, Val Verde County subcontracted

---

[1] Federal detainees are housed at the facility pursuant to a long-standing "Intergovernmental Service Agreement between the United States Marshals Service and Val Verde County" (the "IGA"), in which Val Verde County agreed to house and care for federal detainees. (ECF No. 48 at 9-10.) In the IGA, Val Verde County agreed to: "accept and provide for the secure custody, and safekeeping, housing, subsistence, and care of federal detainees; provide federal detainees with the same level and range of care inside the jail as provided to state and local detainees; act immediately with necessary medical treatment for federal detainees requiring a medical emergency such as attempted or completed suicide; have a written policy, procedure, and practice that all special management federal detainees were personally observed by a correctional officer twice per hour, but no more than 40 minutes apart, in an irregular schedule; place mentally ill federal detainees

2

its responsibilities to GEO to act on behalf of the county.[2] (*Id.* at 11.) GEO thereafter was authorized to hire doctors and prison personnel to care for inmates at VVCF. (*See id.* at 7-9.)

GEO hired Defendant Antonio Cadena, Jr., M.D. ("Dr. Cadena")[3] as the medical director at VVCF. (*Id.* at 8.) Having facilitated Killin's transfer from Karnes County to VVCF, Dr. Cadena noted that Killin had PTSD and should be "referred to psych." (*Id.* at 23-24.) Killin underwent a new mental health evaluation as part of the transfer. (*Id.* at 24.) He indicated that he suffered domestic abuse as a child, slept three hours per night, had flashbacks and nightmares, and previously attempted suicide in 2005 at age ten. (*Id.*) Based on the evaluation, Killin was scheduled for the next available psychiatry appointment and was recommended for housing within the general population. (*Id.*)

Over a month later, Defendant Jether Farino, M.D. ("Dr. Farino"),[4] a licensed physician with a specialty in psychiatry, conducted an initial psychiatric evaluation of Killin via "telehealth." (*Id.* at 8, 24.) Dr. Farino noted Killin's history of PTSD and suicide attempt at age ten, as well as his current symptoms of anxiety, daily nightmares, sleeping three to four hours a day, isolation, and increased vigilance. (*Id.* at 24.) After diagnosing Killin with PTSD and insomnia, Dr. Farino prescribed anti-depressants – Zoloft and Trazodone – and recommended a follow-up appointment

---

under 'constant observation'"; and indemnify for all liability caused by any act of any member of the County. (*Id.* at 10-11).

[2] The 2006 Services Agreement between Val Vede County and GEO (the "SA") acknowledged that GEO would house, at VVCF, non-County inmates pursuant to contracts either between (1) GEO and the sending authority or (2) Val Verde County and the sending authority. (ECF No. 48 at 12.) The SA mandated these contracts abide by Texas law. (*Id.*)

[3] According to the amended complaint, Dr. Cadena was either employed by and/or contracted with GEO. (ECF No. 48 at 8.)

[4] According to the amended complaint, Dr. Farino was either employed by and/or contracted with GEO. (ECF No. 48 at 8.)

in four to six weeks. (*Id.* at 25.) However, Dr. Farino neither referred Killin for psychotherapy, the first line of treatment for PTSD,[5] nor scheduled him for follow-up care. (*Id.*)

On April 1, 2020, Defendant Magdalene Garza, M.D. ("Dr. Garza"),[6] a board-certified psychiatrist, renewed Killin's medications without seeing or speaking with Killin. (*Id.* at 9, 26.) Dr. Garza set Killin for an appointment in four to six weeks. (*Id.* at 26.) On May 6, 2020, Killin spoke with a nurse via "telehealth" about his medication management. (*Id.*) The nurse noted Killin's PTSD diagnosis and continuing "bothersome and stressful" nightmares. (*Id.*) The nurse added to Killin's medication regimen, Prazosin – an off-label medication to reduce PTSD-related nightmares. (*Id.*)

After a telehealth appointment on July 15, 2020, Dr. Garza noted Killin's PTSD diagnosis and continuing nightmares. (*Id.*) Killin was still not referred to counseling or psychotherapy for his PTSD, and his medication regimen remained unchanged. (*Id.*) Then, on October 14, 2020, at Dr. Garza's instruction, Killin abruptly stopped receiving Zoloft, Trazodone, and Prazosin. (*Id.* at 26-27.) Dr. Garza did not explain her reasoning or provide a bridge treatment plan following the discontinuation. (*Id.*)

After being off medication for over a month, Killin requested transfer from the general population to solitary confinement. (*Id.* at 29-30.) Defendant Warden Christopher Martinez

---

[5] In support, the Plaintiff cites to: Emma Paintain & Simon Cassidy, *First-line Therapy for Post-traumatic Stress Disorder: A Systematic Review of Cognitive Behavioural Therapy and Psychodynamic Approaches*, 18 Counselling and Psychotherapy Research 237, 250 (2018). (ECF No. 48 at 25 n.20.)

[6] According to the amended complaint, Dr. Garza was either employed by and/or contracted with GEO. (ECF No. 48 at 9.)

("Warden Martinez"),[7] a Facility Administrator of VVCF, approved Killin's request on December 7, 2020, after a medical evaluation cleared Killin for the reassignment. (*Id.* at 7, 8, 27-29.) Killin, however, did not undergo a new mental health evaluation as part of the transfer. (*Id.* at 29-30.)

Defendant Jessica Beachkofsky, M.D. ("Dr. Beachkofsky"),[8] a board-certified psychiatrist, met with Killin via "telemental" on December 17, 2020. (*Id.* at 8-9, 40.) As Dr. Cadena, Dr. Farino, and Dr. Garza noted before, Dr. Beachkofsky flagged Killin's PTSD diagnosis, five to six hours a day of sleep, and worsening anxiety. (*Id.* at 40.) Dr. Beachkofsky recommended that Killin take Benadryl, an over-the-counter antihistamine. (*Id.*) She did *not*, however, prescribe any psychiatric medications, recommend psychotherapy, or request Killin's removal from solitary confinement. (*Id.*)

On January 15, 2021, Killin raised an issue with his mental health treatment plan. (*Id.* at 39-41.) Dr. Cadena notated on a "Refusal of Health Services" form that Killin was "on meds" but the treatment was "not working." (*See id.* at 40-41.) That same day, Warden Martinez renewed approval of Killin's placement in solitary confinement. (*See id.* at 39-40.)

On February 5, 2021, Killin saw a psychologist for the first time. (*Id.* at 41.) The psychologist documented Killin's history of suicide attempt, PTSD, night terrors, and anxiety, and recommended a follow-up assessment in a week. (*Id.*) No recommendation was made to remove Killin from solitary confinement or implement suicide prevention measures. (*Id.*) In a follow up appointment on February 10, 2021, the psychologist recommended that Killin receive weekly

---

[7] According to the amended complaint, Warden Martinez was either employed by and/or contracted with GEO. (ECF No. 48 at 7-8.)

[8] According to the amended complaint, Dr. Beachkofsky was either employed by and/or contracted with GEO. (ECF No. 48 at 9-10.)

counseling if he were to remain in solitary confinement. (*Id.*) However, the psychologist again made no recommendation to increase suicide protective measures. (*Id.*)

Dr. Beachkofsky saw Killin again on February 24, 2021. (*Id.* at 41-42.) Killin reported increased anxiety, worsening mood, and only four to five hours of sleep a night. (*Id.*) Dr. Beachkofsky prescribed Amitriptyline, an antidepressant that contains a "black box warning" for adolescents and young adults under the age of 24 because of one of its side effects: an increased risk of suicidal ideation and suicidal behaviors. (*Id.* at 42.) The black box warning states, "[p]atients of all ages who are started on antidepressant therapy should be monitored appropriately and observed closely for clinical worsening, suicidality, or unusual changes in behavior." (*Id.*) Though Dr. Beachkofsky scheduled a follow-up appointment within the next four to six weeks, she did not recommend that any suicide prevention measures be implemented during the drug initiation period. (*Id.* at 43.)

On March 10, 2021, Warden Martinez once again renewed his approval of Killin's placement in solitary confinement. (*See id.* at 39-40.) On March 13, 2021, after taking Amitriptyline nightly for ten days, Killin hanged himself in his cell. (*Id.* at 43.) At the time of his death, Killin's blood-alcohol concentration was 0.131%. (*Id.* at 47.) Killin's cell was strewn with several grape jelly containers, presumably used to make a homemade intoxicant. (*Id.* at 49.) Despite the presence of the empty containers, GEO records indicated that (1) prison personnel had conducted 48 cell checks in the 24 hours preceding Killin's death, and (2) nurses had given perfect ratings as to his suicide risk, nutrition, and hygiene in the days leading up to Killin's death. (*Id.* at 50-51.)

## II.    PROCEDURAL HISTORY

On July 14, 2022, Plaintiff Jennifer Guadarrama, Killin's mother, who is acting in her individual capacity and as the executor of the estate of Killin, filed the present suit against the Defendants. (ECF No. 1.) After considering motions to dismiss the original complaint, the Court denied the motions without prejudice and permitted the Plaintiff to conduct limited discovery and amend the complaint. (ECF No. 36.) Since then, Val Verde County and GEO filed motions to quash the Plaintiff's attempt to subpoena and seek discovery, claiming it exceeds the limited discovery set forth by the Court. (ECF Nos. 37, 38, 39, 40.)

The Plaintiff timely filed an amended complaint on October 20, 2023. (ECF No. 48.) In her amended complaint, she lays out four causes of action: (1) violations of 42 U.S.C. § 1983 against all the Defendants; (2) violations of the Americans with Disabilities Act ("ADA"), 42 U.S.C. § 12101 *et seq.*, against Val Verde County and GEO; (3) violations of the Rehabilitation Act, 29 U.S.C. § 794, against Val Verde County and GEO; and (4) negligence claims against all the Defendants. She also seeks to recover exemplary damages. In response, the Defendants filed the present motions to dismiss under Rule 12(b)(6) of the Federal Rules of Civil Procedure. (ECF Nos. 54, 57, 61, 63, 64.)

## III.    LEGAL STANDARD

Rule 12(b)(6) allows a party to file a motion to dismiss based on a "failure to state a claim upon which relief can be granted." Fed. R. Civ. P. 12(b)(6). To survive a Rule 12(b)(6) motion to dismiss, a plaintiff must allege sufficient facts "to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).

"The court accepts all well-pleaded facts as true, viewing them in the light most favorable to the plaintiff." *In re Katrina Canal Breaches Litig.*, 495 F.3d 191, 205 (5th Cir. 2007) (quotations omitted). However, "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Iqbal*, 556 U.S. at 678. In ruling on a Rule 12(b)(6) motion to dismiss, courts generally should not go beyond the pleadings and "must limit their inquiry to the facts stated in the complaint and the documents either attached to or incorporated in the complaint." *Lovelace v. Software Spectrum Inc.*, 78 F.3d 1015, 1017 (5th Cir. 1996); Fed R. Civ. P. 12(d).

## IV.    42 U.S.C. § 1983 CLAIMS

"A person may assert a § 1983 claim against anyone who 'under color of any statute, ordinance, regulation, custom, or usage, of any State' violates that person's right under the Constitution." *Anderson v. Valdez*, 845 F.3d 580, 599 (5th Cir. 2016) (quoting 42 U.S.C. § 1983). To establish a claim under § 1983, a plaintiff "must (1) allege a violation of a right secured by the Constitution or laws of the United States and (2) demonstrate that the alleged deprivation was committed by a person acting under color of state law." *Id.* (quoting *Whitley v. Hanna*, 726 F.3d 631, 638 (5th Cir. 2013)). A private actor may be subject to liability under § 1983 when the private actor (1) acted as a state actor [9] (2) in causing the deprivation of an individual's federal right. *See Lugar v. Edmondson Oil Co.*, 457 U.S. 922, 937 (1982); *see also Webb v. Town of St. Joseph*, 925 F.3d 209, 214 (5th Cir. 2019).[10]

---

[9] A primary contention is whether Dr. Farino, Dr. Garza, Dr. Beachkofsky, Dr. Cadena, Warden Martinez, and GEO were state actors. As explained below, the Court needs not address that issue because the Plaintiff fails to establish these Defendants had knowledge of a substantial risk of serious harm or acted with deliberate indifference.

[10] Under certain circumstances, a defendant, who acts under color of state law for purposes of 42 U.S.C. § 1983, may be entitled to qualified immunity. *Brewer v. Hayne*, 860 F.3d 819, 823 (5th

The Plaintiff alleges that the Defendants violated Killin's due process rights under the Fourteenth Amendment, which guarantees a pretrial detainee's procedural and substantive due process rights. *See Jacobs v. W. Feliciana Sheriff's Dep't*, 228 F.3d 388, 393 (5th Cir. 2000). These rights include the right to medical care and the right to be protected from known suicidal tendencies. *See Sanchez v. Young Cnty.*, 956 F.3d 785, 791 (5th Cir. 2020). To establish a § 1983 claim on this basis, a pretrial detainee may bring constitutional challenges under two alternative theories: "as an attack on a 'condition of confinement' or as an 'episodic act or omission.'" *Estate of Henson v. Wichita Cnty.*, 795 F.3d 456, 462 (5th Cir. 2015) (quoting *Shepherd v. Dallas Cnty.*, 591 F.3d 445, 452 (5th Cir. 2009)).[11]

## A. Dr. Farino, Dr. Garza, Dr. Beachkofsky, Dr. Cadena, and Warden Martinez

The Court will first evaluate the Plaintiff's § 1983 claims against Dr. Farino, Dr. Garza, Dr. Dr. Beachkofsky, Dr. Cadena, and Warden Martinez (collectively the "Individual Defendants"). The Plaintiff alleges that the Individual Defendants' episodic acts or omissions in treating and caring for Killin resulted in a violation of Killin's due process rights under the Fourteenth Amendment. The Plaintiff also argues that the Individual Defendants are liable for the episodic acts or omissions of each other under a theory of bystander liability. Lastly, the Plaintiff states separate § 1983 claims against Warden Martinez, in his official capacity, and Dr. Cadena, in his supervisory capacity.

To establish a Fourteenth Amendment claim based on an episodic act or omission, a plaintiff must allege that a state actor had "subjective knowledge of a substantial risk of serious

---

Cir. 2017) (citing *Richardson v. McKnight*, 521 U.S. 399, 408-09 (1997)). None of the Defendants raise a qualified immunity defense.

[11] A plaintiff can plead both alternative theories, and a court can evaluate each separately. *Estate of Henson*, 795 F.3d at 464.

harm to the detainee and responded to that risk with deliberate indifference." *Estate of Henson*, 795 F.3d at 464 (quotations omitted). The analysis is a two-step inquiry and does not require any subjective intent to cause harm. *See Dyer v. Houston*, 964 F.3d 374, 380 (5th Cir. 2020).

To have subjective knowledge, "[t]he official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, *and he must also draw the inference.*" *Domino v. Tex. Dept. of Crim. J.*, 239 F.3d 752, 755 (5th Cir. 2001) (quoting *Farmer v. Brennan*, 511 U.S. 825, 837 (1994)). A prison official acts with deliberate indifference if he "refused to treat [the detainee], ignored his complaints, intentionally treated him incorrectly, or engaged in any similar conduct that would clearly evince a wanton disregard for any serious medical needs." *Johnson v. Treen*, 759 F.2d 1236, 1238 (5th Cir. 1985).

"Suicide is an objectively serious harm implicating the state's duty to provide adequate medical care." *Arenas v. Calhoun*, 922 F.3d 616, 621 (5th Cir. 2019). Suicide, however, is "inherently difficult for anyone to predict, particularly in the depressing prison setting." *Domino*, 239 F.3d at 756. Therefore, "[i]n the context of detainee suicide, the requisite substantial risk of serious harm must be specific; plaintiffs must allege defendants 'were aware of a substantial and significant risk that the detainee might kill himself.'" *Edmiston v. Borrego*, 75 F. 4th 551, 559-60 (5th Cir. 2023) (quoting *Cope v. Cogdill*, 3 F.4th 198, 207 (5th Cir. 2015)).

The Plaintiff does not plausibly allege that the Individual Defendants *knew* of a *substantial risk* of serious harm, i.e., suicide.[12] At most, she alleges that the Individual Defendants knew of

---

[12] It is unclear from the amended complaint whether the Plaintiff also claims Killin's PTSD is a serious harm. Nonetheless, the Plaintiff cannot establish that the Individual Defendants responded to Killin's PTSD symptoms with deliberate indifference. "Deliberate indifference is an extremely high standard to meet" and requires egregious conduct. *Cope*, 3 F.4th at 207 (quotations omitted). "Unsuccessful medical treatment, acts of negligence, or medical malpractice do not constitute deliberate indifference, nor does a prisoner's disagreement with his medical treatment, absent exceptional circumstances." *Gobert v. Caldwell*, 463 F.3d 339, 346 (5th Cir. 2006). The Plaintiff

Killin's PTSD, nightmares, worsening anxiety, trouble sleeping, changes in medication, and a suicide attempt at the age of ten. (*See* ECF No. 48 at 17, 23-24, 26, 33-34, 40-42.) The Plaintiff, however, does not allege that Killin expressed, or the Individual Defendants knew of, any *recent* suicidal ideations. "[C]ontemporaneity matters." *Guillot on Behalf of T.A.G. v. Russell*, 59 F.4th 743, 757 (5th Cir. 2023). A suicide attempt over ten years earlier is simply not contemporaneous enough to establish a substantial risk of serious harm.[13] Without subjective knowledge of a substantial risk of harm, the Individual Defendants cannot respond to a substantial risk with deliberate indifference.

Still, the Plaintiff specifically challenges Dr. Garza's sudden cessation of medications on October 14, 2020, and Dr. Beachkofsky's prescription of an antidepressant with a black box warning,[14] which advises adolescents to be closely monitored for behavioral changes. These actions may have increased the likelihood of suicide. But, the Plaintiff still does not plausibly allege Dr. Garza and Dr. Beachkofsky had subjective knowledge of a *substantial* risk of harm because Killin never expressed any suicidal ideation before or after being cut off Prazosin, Zoloft, and Trazodone, or before or after starting Amitriptyline. *C.f., Converse v. City of Kemah*, 961 F.3d 771, 776 (5th Cir. 2020) (concluding an officer had subjective knowledge of the decedent's

---

does not adequately allege deliberate indifference, where Killin received at least some medical treatment for his PTSD, on a regular basis. (ECF No. 48 at 23-30, 40-43.)

[13] Generally, an expression of suicidal ideation must be very recent. *Compare Jacobs v. West Feliciana Sheriff's Dep't*, 228 F.3d 388 (5th Cir. 2000) (less than four days' notice of obvious suicidal inclinations was sufficient to establish a sheriff's knowledge of a substantial risk of suicide) *with Guillot*, 59 F. 4th at 757 (suicidal expressions ten days prior was too remote to establish such knowledge of a substantial risk of suicide).

[14] The FDA directs manufacturers of *all* antidepressant medications to include a black box warning. *See* U.S. Federal Food and Drug Administration,. 2018. Suicidality in Children and Adolescents Being Treated with Antidepressant Medications (Feb. 5, 2018). https://www.fda.gov/drugs/postmarket-drug-safety-information-patients-and-providers/suicidality-children-and-adolescents-being-treated-antidepressant-medications.

suicidality when he received the call that the decedent was on the bridge and ready to jump, was present when the decedent was brought into custody, heard the decedent say that he would jump tomorrow when he got out of jail, and witnessed the decedent yelling for medical help).

There is also no merit to the Plaintiff's bystander liability claim. A state actor "may be liable under § 1983 under a theory of bystander liability where the officer '(1) knows that a fellow officer is violating an individual's constitutional rights; (2) has a reasonable opportunity to prevent the harm; and (3) chooses not to act.'" *Whitley*, 726 F.3d at 646 (quoting *Randall v. Prince George's Cnty.*, 302 F.3d 188, 204 (4th Cir. 2002)). But without a constitutional violation, there can be no bystander liability.

Likewise, the Plaintiff's § 1983 claim against Dr. Cadena in his supervisory capacity is without merit. "A supervisory official may be held liable under § 1983 only if (1) he affirmatively participates in the acts that cause the constitutional deprivation, or (2) he implements unconstitutional policies that causally result in the constitutional injury." *Gates v. Tex. Dep't of Protective & Regul. Servs.*, 537 F.3d 404, 435 (5th Cir. 2008) (citing *Baker v. Putnal*, 75 F.3d 190, 199 (5th Cir. 1996)). Because there was no constitutional violation, Dr. Cadena cannot be held liable for his supervisory acts as the medical director.

Lastly, the Plaintiff's claim against Warden Martinez in his official capacity must be dismissed. Employees of private companies have "no official capacities in which they could be sued." *Ellibee v. Leonard*, 226 F. App'x. 351, 357 (5th Cir. 2007). Because Warden Martinez is either employed by or contracted with GEO, a private company, he does not have official capacity in which he can be sued. Even if he had official capacity, the claims against a public officer in his official capacity and the public entity for which he works "essentially merge," *see Turner v. Houma Mun. Fire & Police Civ. Serv. Bd.*, 229 F.3d 478, 485 (5th Cir. 2000)), and, in that case, the court

12

may dismiss the claims against the public official as duplicative, *see, e.g., Flores v. Cameron Cnty.*, 92 F.3d 258, 261 (5th Cir. 1996). Because the Plaintiff brings suit against GEO, the claim against Warden Martinez in his official capacity is duplicative and may be dismissed.

### B. Val Verde County and GEO

Next, the Court will turn to the municipal liability claims against Val Verde County and GEO. The Plaintiff contends that Val Verde County and GEO are directly liable under *Monell v. New York City Department of Social Services of the City of New York*, 436 U.S. 658 (1978), for constitutional violations arising from Killin's conditions of confinement.[15]

Vicarious liability is inapplicable to § 1983 suits. *See Piotrowski v. City of Houston*, 237 F.3d 567, 578 (5th Cir. 2001). Rather, a municipality is only responsible for the unconstitutional conduct that is "directly attributable to the municipality through some sort of official action or imprimatur." *Id.* To establish liability for a § 1983 claim against a municipality, a plaintiff must plead facts that plausibly establish "a policy maker, an official policy, and a violation of constitutional rights whose 'moving force' is the policy or custom." *Ratliff v. Aransas Cnty.*, 948 F.3d 281, 285 (5th Cir. 2020) (quoting *Piotrowski*, 237 F.3d at 578).[16]

---

[15] Both counties and private companies who manage correctional centers are subjective to *Monell* liability. *See Moore v. LaSalle Mgmt. Co.*, 41 F.4th 493, 509-511(5th Cir. 2022.) Similarly, "[a] private company . . . that has been hired to run the medical department at a [ ] jail is treated as a municipal or local governmental entity for the purposes of 42 U.S.C. § 1983, and, therefore, claims against such a company are analyzed as '*Monell*' claims." *Alexander v. S. Health Partners, Inc.*, Civ. No. 3:22-cv-0395-X, 2023 WL 3961704, at *7 (N.D. Tex. June 12, 2023) (quoting *Guillotte v. Knowlin*, Civ. No. 21-1422, 2021 WL 7632004, at *2 (E.D. La. Dec. 7, 2021), *report and recommendation adopted*, 2002 WL 355509 (E.D. La. Feb. 07, 2022)).

[16] A county is not qualifiedly immune from liability. *See Owen v. City of Independence*, 445 U.S. 622 (1980).

### 1. Official Policy

The Plaintiff does not adequately allege the existence of an official policy of Val Verde County or GEO. An official policy can be shown by alleging one of the following: (1) an official policy that is ordinarily contained in duly promulgated policy statements, ordinances, or regulations, *Piotrowski*, 237 F.3d at 579; (2) a custom or usage "so persistent and widespread as to practically have the force of law," *Ratliff*, 948 F.3d at 285 (quoting *Peña v. City of Rio Grande City*, 879 F.3d 613, 622 (5th Cir. 2018)); or (3) "even a single decision . . . when the official or entity possessing final policymaking authority for an action performs the specific act that forms the basis of the § 1983 claim," *Webb*, 925 F.3d at 215 (quoting *Davidson v. City of Stafford*, 848 F.3d 384, 395 (5th Cir. 2017)).

The Plaintiff attempts to establish municipal policies through the second prong—through widespread practice and custom. To establish an official policy on this basis, a plaintiff cannot simply describe the incident that led to his injury. *Peña*, 879 F.3d at 622. Instead, a plaintiff must plead a pattern of abuses – illustrating similarity, specificity, and "sufficiently numerous prior incidents." *Peterson v. City of Fort Worth*, 588 F.3d 838, 851 (5th Cir. 2009) (quoting *McConney v. City of Houston*, 863 F.2d 1180, 1184 (5th Cir. 1989)). A plaintiff also needs to allege the municipality's actual or constructive knowledge of the alleged custom or usage. *Webster v. City of Houston*, 735 F.2d 838, 841 (5th Cir. 1984). Sufficient duration or frequency of abusive practices can imply such knowledge. *Bennett v. City of Slidell*, 728 F.2d 762, 768 (5th Cir. 1984).

The Plaintiff fails to allege the existence of an official policy through custom or usage. In the amended complaint, the Plaintiff lays out various "policies, practices, and/or customs" that led to Killin's death but does not plead a sufficient number of prior incidents with any concreteness. Without more specific facts, this Court cannot gauge the extent of the alleged practices and cannot

14

determine whether these "policies, practices, and/or customs" were indeed official policies. *See Pineda v. City of Houston*, 291 F.3d 325 (5th Cir. 2002) (holding that 11 incidents of warrantless entry out of 5,000 offense reports did not support a pattern of unconstitutional warrantless entry); *see also Peterson*, 588 F.3d at 838 (finding that 27 complaints of excessive force over three years did not constitute a custom).[17]

## 2. Constitutional Violation

The Plaintiff also does not sufficiently allege that (1) a constitutional violation occurred, or (2) the municipal policy was the moving force behind the violation. *See Monell*, 436 U.S. at 694. As stated earlier, a plaintiff can bring a § 1983 claim based on either the overall conditions of confinement or a state actor's episodic act or omission. The Plaintiff brings a conditions-of-confinement claim against Val Verde County and GEO.

A conditions-of-confinement claim attacks "general conditions, practices, rules, or restrictions of pretrial confinement." *Estate of Henson*, 795 F.3d at 463. "Since pretrial detainees have not been convicted of a crime, their conditions of confinement cannot be used as punishment." *Finch v. Tex. Dep't of Pub. Safety*, No. 6:22-CV-026, 2024 WL 791000 (E.D. Tex. Jan. 12, 2024), *report and recommendation adopted,* 2024 WL 778390 (E.D. Tex. Feb. 26, 2024). "[I]f a particular condition or restriction of pretrial detention is reasonably related to a legitimate governmental objective, it does not, without more, amount to 'punishment.'" *Bell v. Wolfish*, 441 U.S. 520, 539 (1979). "Conversely, if a restriction or condition is not reasonably related to a legitimate goal—if it is arbitrary or purposeless—a court may infer that the purpose of the

---

[17] The Plaintiff conflates policies of GEO and Val Verde County. For example, the Plaintiff claims that Val Verde County had a custom for "guards to only perform visual checks every 30 minutes in the solitary unit." (ECF No. 48 at 58.) Later in the amended complaint, the Plaintiff alleges that this is GEO's policy. (*See id.* at 60.)

governmental action is punishment that may not be inflicted upon" a detainee. *Id.* Accordingly, to show that a pretrial condition amounted to punishment, a plaintiff must show the existence of an identifiable intended condition or practice that: (1) was sufficiently extended or pervasive; (2) "was not reasonably related to a legitimate governmental objective;" and (3) "caused the violation of [the pretrial detainee's] constitutional rights." *Estate of Henson*, 795 F.3d at 468 (quoting *Duvall v. Dallas Cnty.*, 631 F.3d 203, 207 (5th Cir. 2011)).

In support of this claim, the Plaintiff lists a series of "policies" that led to the violation of Killin's rights to reasonable medical care and protection from harm. (*See* ECF No. 48 at 55-61.) For example, the Plaintiff contends that Val Verde County and GEO had a practice of (i) housing inmates in solitary confinement upon their request, (ii) monitoring inmates in solitary confinement only twice per hour, (iii) not performing required periodic observations of inmates by guards and nursing staff, not appropriately documenting any observation made, and/or falsifying observation records, (iv) not treating PTSD, (v) understaffing, (vi) allowing multiple containers and items in cells to make alcohol, (vii) not conducting cell checks for contraband, and (viii) allowing detainees to commit suicide. (*Id.*) These alleged "policies," however, do not plausibly amount to punishment because the Plaintiff does not allege that they were extended or pervasive. (*See id.* at 58-61.)

The Plaintiff separately attempts to establish a constitutional violation by alleging that GEO violated the Texas Commission on Jail Standards, [*see* ECF No. 48 at 27, 57-58], but "a violation of a state statute alone is not cognizable under § 1983 because §1983 is only a remedy for violations of *federal* statutory and constitutional rights." *Woodard v. Andrus*, 419 F.3d 348, 353 (5th Cir. 2005); *Beltran v. City of El Paso*, 367 F.3d 299, n.1 (5th Cir. 2004) ("§ 1983 was designed to protect against the violation of federal constitutional and statutory rights, not those

16

crated by state statute."); *Stern v. Tarrant Cnty., Hosp. Dist.*, 778 F.2d 1052, 1059 (5th Cir. 1985) ("[A] violation of state law is neither a necessary nor a sufficient condition for a finding of a due process violation.").

Nor can solitary confinement be the basis for a due process claim unless it "imposes atypical and significant hardship on the inmate in relation to the ordinary incidents of prison life." *Bailey v. Fisher*, 647 F. App'x 472, 474 (5th Cir. 2016); *Sandin v. Conner*, 51 U.S. 472, 484 (1995). The Plaintiff does not plausibly allege that Killin's placement in solitary confinement, voluntary or not, constitutes punishment. Broad deference is given to prison administrators in adopting and executing policies and practices for safety and security within a prison. *See Bell,* 441 U.S. at 547. Killin's placement in solitary confinement for 96 days falls far short of what is generally necessary to constitute punishment. *See, e.g., Hope v. Harris*, 861 F. App'x 571, 580-81 (5th Cir. 2021) (affirming that a plaintiff failed to state a procedural due process claim, despite his placement in solitary confinement for over two decades, partly because the court "give[s] substantial deference to prison management decisions before mandating additional expenditures for elaborate procedural safeguards").[18] Thus, the § 1983 claims against Val Verde County and GEO are without merit.[19]

---

[18] Because there is no underlying constitutional violation, the court does not need to address the Plaintiff's argument that Val Verde County has a non-delegable duty to provide medical care to pretrial detainees. (ECF No. 48 at 179.)

[19] The Plaintiff also fails to sufficiently allege that a Val Verde County policy was the moving force behind any violation of Killin's constitutional rights. To prove that a policy was the moving force, there must be a direct causality between the policy and the violation. *See Peterson*, 588 F.3d at 848. That is, the policy must be unconstitutional or be adopted with deliberate indifference to the "known or obvious fact that such unconstitutional violations would result." *Webb*, 925 F.3d at 219 (5th Cir. 2019) (quoting *Shumpert v. City of Tupelo*, 905 F.3d 310, 316-17 (5th Cir. 2018)). The amended complaint does not contain any language reflecting Val Verde County's subjective knowledge of conditions at VVCF.

## V.    Americans with Disabilities Act and Rehabilitation Act

Now, the Court will turn to the Plaintiff's claims against Val Verde County and GEO under the Americans with Disabilities Act and the Rehabilitation Act of 1973.  The Plaintiff pleads that Val Verde County and GEO violated Title II of the Americans with Disabilities Act (the "ADA"), 42 U.S.C § 12132 et seq., and the Rehabilitation Act of 1973 (the "RA"), 29 U.S.C. § 794.  Title II of the ADA states that: "[N]o qualified individual with a disability shall, by reason of such disability, be . . . denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any such entity." 42 U.S.C. § 12132.  Section 504 of the RA provides that: "No otherwise qualified individual with a disability . . . shall, solely by reason of his or her disability, . . . be subjected to discrimination under any program or activity receiving Federal financial assistance . . . ." 29 U.S.C. § 794.  The Plaintiff alleges that the death of Killin resulted from Val Verde's and/or GEO's intentional discrimination against Killin, in violation of the ADA and the RA.  (ECF No. 48 at 73-76.)

The analysis of claims brought under the ADA and the RA is the same.[20]  *T.O. v. Fort Bend Indep. Sch. Dist.*, 2 F.4th 407, 416 (5th Cir. 2021).  To survive a motion to dismiss, a plaintiff must demonstrate: "(1) that he is a qualified individual; (2) that he is being excluded from participation in, or being denied benefits of, services, programs, or activities for which the public entity is responsible, or is otherwise being discriminated against by the public entity;[21] and (3) that such

---

[20] "The only material difference... lies in their respective causation requirements." *T.O. v. Fort Bend Indep. Sch. Dist.*, 2 F.4th 407, 416-17 (5th Cir. 2021) (quoting *Bennett-Nelson v. La. Bd. of Regents*, 431 F.3d 448, 454 (5th Cir. 2005) (explaining that a § 504 claim requires that the discrimination be "solely by reason" of the disability, whereas an ADA claim does not require the same)).  Furthermore, unlike the ADA, the RA is applicable only to entities receiving federal funds. *See Pace v. Bogalusa City Sch. Bd.*, 403 F.3d 272, 291 (5th Cir. 2005).

[21] Val Verde County and GEO are public entities.  Public entities include local governments or any other instrumentality of a State or States or local government.  42 U.S.C. § 12131(1).  Val Verde

18

exclusion, denial of benefits, or discrimination is by reason of his disability." *Id.* at 417. A plaintiff does not need to identify an official policy to sustain such a claim, and a public entity may be held vicariously liable for the acts of its employees under either statute. *Id.*

First, Killin is not a qualified individual with a disability. "Qualified individual with a disability" is defined as an individual with a disability who, with or without reasonable modifications to rules, policies, or practices . . . meets the essential eligibility requirements for the receipt of services or the participation in programs or activities provided by a public entity. 42 U.S.C. § 12131(2). *See also* 29 U.S.C. § 705 (20)(B) ("'[I]ndividual with a disability' means . . . any person who has a disability as defined in section 3 of the American Disabilities Act of 1990"). Disability means "(A) a physical or mental impairment that substantially limits one or more of the major life activities of such individual; (B) a record of such an impairment; or (C) being regarded as having such an impairment." 42 U.S.C. § 12102(1); *see also* 29 U.S.C. § 705 (20)(A). In short, disability is "a physical or mental impairment that substantially limits one or more major life activities of an individual." 29 C.F.R. § 1630.2(g)(1)(i).

Major life activities are "those activities that are of central importance to daily life." *Toyota Motor Mfg., Ky., Inc. v. Williams*, 534 U.S. 184, 197 (2002). "[T]o be substantially limited means to be unable to perform a major life activity that the average person in the general population can perform, or to be significantly restricted in the ability to perform it." *EEOC v. Chevron Phillips Chem. Co.*, 570 F.3d 606, 614 (5th Cir. 2009) (*citing* 29 C.F.R. § 1630.2(j)); *see also Dutcher v.*

---

County is a public entity because it is a local government. *See id.* GEO is also a public entity because "all governmental activities of public entities[, including incarceration of citizens,] are covered, even if they are carried out by contractors." *See* 56 FR 35694, 35696 (July 26, 1991). *See also Lee v. Corr. Corp. of Am.*, 61 F. Supp. 3d 139, 143 (D.C. 2014).

19

*Ingalls Shipbuilding*, 53 F.3d 723, 726 (5th Cir. 1995) ("[29 C.F.R. § 1630.2] adopt[s] the same definition of major life activities as used in the Rehabilitation Act.").

Killin was diagnosed with PTSD, which is not a disability contemplated by the ADA unless it substantially limits one or more of the major life activities. *See Hamilton v. Sw. Bell Tel. Co.*, 136 F.3d 1047, 1050 (5th Cir. 1998). Out of the symptoms that Killin experienced, trouble sleeping is the only symptom that *may* fall under the category of a major life activity. *See* 29 C.F.R. § 1630.2(i)(1)(i). However, the Fifth Circuit has never recognized sleeping as a major life activity. *Carter v. Ridge*, 255 F. App'x 826, 830 (5th Cir. 2007).[22]

Even if Killin was disabled under the ADA or the RA, the facts do not show that Killin was excluded from benefits of services, programs, or activities provided to pretrial detainees in the general population unit. While discrimination under the ADA and the RA may include a defendant's failure to make reasonable accommodations to the needs of a disabled person, *see Melton v. DART*, 391 F.3d 669, 672 (5th Cir. 2004), the affirmative obligation to provide reasonable accommodations does not require a public entity to guess an individual's need for an accommodation, *see McCoy v. Tex. Dep't of Crim. Justice*, C.A. No. C-05-370, 2006 WL 2331055, *7 (S.D. Tex. Aug. 9, 2006). Instead, the obligation attaches when "the [defendant] knew not only of the [individual's] disability, but also of the physical or mental limitations resulting therefrom." *Id.* (quoting *Seaman v. CSPH, Inc.*, 179 F.3d 297, 300 (5th Cir. 1999)). It is also a disabled individual's burden to request an accommodation when the disability, resulting limitations, and

---

[22] A diagnosis of anxiety disorder may fall under the ADA. However, the Plaintiff only alleges anxiety, not anxiety disorder. *See Mann v. La. High Sch. Athletic Ass'n*, 535 F. App'x 405, 411-12 (5th Cir. 2013).

necessary reasonable accommodations, are not open, obvious and apparent. *See Taylor v. Principal Fin. Grp., Inc.*, 93 F.3d 155, 165 (5th Cir. 1996).

In the amended complaint, the Plaintiff points to Killin's placement in solitary confinement as a failure to make reasonable accommodations. (ECF No. 48 at 73-75.)  But Killin transferred to solitary confinement per his own request, which was accommodated.  There is no additional allegation of any request made by Killin related to his PTSD diagnosis that was denied.[23]

## VI.    Negligence Claims

The only remaining claims are the Plaintiff's negligence claims.  The only alleged basis for jurisdiction over these claims is under 28 U.S.C. § 1367(a).  This section provides that "in any civil action of which the district courts have original jurisdiction, the district courts shall have supplemental jurisdiction over all other claims that are so related to claims in the action within such original jurisdiction that they form part of the same case or controversy under Article III of the United States Constitution." § 1367(a).  Section 1367(c), however, also provides:

> (c) The district courts may decline to exercise supplemental jurisdiction over a claim under subsection (a) if—
>
> (1) the claim raises a novel or complex issue of State law,
>
> (2) the claim substantially predominates over the claim or claims over which the district court has original jurisdiction,
>
> (3) the district court has dismissed all claims over which it has original jurisdiction, or
>
> (4) in exceptional circumstances, there are other compelling reasons for declining jurisdiction. § 1367(c).

---

[23] As stated earlier, Killin was provided with some medication for his PTSD symptoms, such as nightmares, worsening anxiety, and trouble sleeping.  He was also provided with psychiatric and psychological services.

21

"[A] district court has wide discretion to refuse to hear a pendent state law claim." *Robertson v. Neuromedical Ctr.*, 161 F.3d 292, 296 (5th Cir. 1998).

With all the federal claims dismissed, the Court declines to exercise supplemental jurisdiction over the remaining state law claims against the Defendants. While this case does not necessarily involve any novel or complex issues of state law, the dismissal of all federal claims provides "a powerful reason to choose not to continue to exercise jurisdiction." *Carnegie–Mellon Univ. v. Cohill*, 484 U.S. 343, 351 (1988). Accordingly, all negligence claims against the Defendants shall be dismissed without prejudice to be refiled in state court.

## VII.   CONCLUSION

For the foregoing reasons, it is hereby **ORDERED** that the motions to dismiss [ECF Nos. 54, 57, 61, 63, 64] are **GRANTED**. All federal claims are **DISMISSED WITH PREJUDICE**, and the Plaintiff's state law claims are **DISMISSED WITHOUT PREJUDICE**. Because no claims remain, any additional pending motions [ECF Nos. 37, 38, 39, 40] are **DENIED AS MOOT**. Finally, it is **ORDERED** that the Clerk of Court shall enter a clerk's judgment and terminate the present cause of action.

SIGNED and ENTERED on this 31st day of March 2026.

ALIA MOSES
Chief United States District Judge

22